IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on November 3, 2016

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | Grand Jury Original |
| | : | |
| DANIEL EDMUND DUGGAN, | : | |
|    also known as | : | VIOLATIONS: |
|    DING SAN XING, | : | |
|    DING SAN QING, | : | |
|    DSQ, | : | 18 U.S.C. § 371 |
|    IVAN, | : | (Conspiracy) |
|          Defendant. | : | |
| | : | 22 U.S.C. § 2778 |
| | : | (Arms Export Control Act) |
| | : | |
| | : | 22 C.F.R. Parts 120-130 |
| | : | (International Traffic in Arms Regulations) |
| | : | |
| | : | 18 U.S.C. § 1956 |
| | : | (Money Laundering) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting, and Causing an Act to be Done) |
| | : | |
| | : | 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) |
| | : | (Criminal Forfeiture) |

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

## (Conspiracy)

At all times material to this Indictment:

### The Conspirators

1. Defendant Daniel Edmund DUGGAN (hereinafter "DUGGAN") was a citizen of the United States of America, a former commissioned officer in the United States Marine Corps, and a Naval Aviator. DUGGAN was also a citizen of Australia.

2. Coconspirator A was a South African national and the Chief Executive Officer of entity and Coconspirator H.

3. Coconspirator B was a national of the People's Republic of China ("PRC") and the owner of entity and Coconspirator F.

4. Coconspirator C was a South African national, lawyer, and an associate of Coconspirator A.

5. Coconspirator D was a United Kingdom national and the Chief Operating Officer of entity and Coconspirator H.

6. Coconspirator E was a United States citizen and a former United States Navy commissioned officer and fighter pilot.

7. Coconspirator F was a business firm based in the PRC that acquired military training, equipment and technical data for the PRC government and military.

8. Coconspirator G was Coconspirator H's chief engineer for military aircraft.

2

9.  Coconspirator H was a test flight academy based in South Africa, with a presence in the PRC. Coconspirator H trained international military pilots and provided professional support to military customers. Coconspirator H conducted flight testing and consultation with a Chinese state-owned enterprise and other companies in South Africa and PRC.

**The Arms Export Control Act and the International Traffic in Arms Regulations**

10.  The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA"), authorizes the President of the United States to control the export of "defense articles" and "defense services" by designating those items and services which shall be considered defense articles and defense services, and by promulgating regulations for the import and export of such items and services, and by imposing certain licensing requirements consistent with those regulations.

11.  The President of the United States delegated his statutory authority to promulgate regulations with respect to the exports of defense articles and defense services to the U.S. Secretary of State by Executive Order 11958, as amended.

12.  The International Traffic in Arms Regulations ("ITAR"), Title 22 of the Code of Federal Regulations, Parts 120 to 130, set forth the specific regulations implementing the AECA.

13.  The ITAR's definition of "export" included: "[p]erforming a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad . . . ." (Title 22, Code of Federal Regulations, Part 120.17(a)(5)).

14.  The ITAR's definition of "defense service" included: "The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair,

maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles;" and, "Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice." (Title 22, Code of Federal Regulations, Part 120.9(a)).

15. Items and services constituting "defense articles" and "defense services" were set forth in the United States Munitions List, Title 22, Code of Federal Regulations, Part 121.1.

16. Under the AECA and the ITAR, a person was required to apply for and obtain a license or other written authorization from the State Department's Directorate of Defense Trade Controls ("DDTC") before exporting defense articles or defense services from the United States.

17. DDTC's license-granting office was located in the District of Columbia.

18. It was the policy of the United States to deny licenses for the export of defense articles or defense services destined for the PRC, PRC nationals, or originating in the PRC. (Title 22, Code of Federal Regulations, Part 126.1(a)).

19. Neither DUGGAN nor any of the coconspirators sought or obtained an export license or other authorization from DDTC to export defense services, defense articles, and/or military training to the PRC or Chinese foreign nationals, as required by AECA and the ITAR.

20. As early as 2008, DUGGAN received an email from the U.S. Department of State informing him that he was required to register with DDTC and apply for written authorization to provide training to a foreign air force.

21. The conduct alleged in the Indictment began outside the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and

is therefore within the venue of the United States District Court for the District of Columbia, as provided by Title 18, United States Code, Sections 3237(a) and 3238.

### The Conspiracy

22. Beginning in or around November 2009, and continuing up to and including on or about November 27, 2012, within the District of Columbia and elsewhere, DUGGAN did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to (a) commit offenses against the United States, that is, to export, attempt to export, and propose the exportation of defense services to the People's Republic of China in violation of an arms embargo imposed upon that country by the United States, and without having first obtained the required license from the Directorate of Defense Trade Controls, United States Department of State, located in the District of Columbia, in violation of Title 22, United States Code, Section 2778 and Title 22, Code of Federal Regulations, Parts 126.1 and 127.1; and (b) defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations relating to the export of defense articles and defense services from the United States, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

### Objects of the Conspiracy

23. The objects of the conspiracy were:

   a. to export defense articles and services to persons and entities outside the United States without a license or other written authorization issued by DDTC;

   b. to evade the prohibitions and licensing requirements of the AECA and the ITAR; and

   c. to conceal the prohibited transactions and services from detection by the

5

United States government so as to avoid penalties.

## Manner and Means of the Conspiracy

24. The manner and means by which DUGGAN and his coconspirators sought to accomplish the objects of the conspiracy, included, among others, the following:

    a. Coconspirator F brokered a contract between Coconspirator H and a state-owned entity of the PRC for Coconspirator H to provide aircraft carrier approach and landing training to PRC military pilots. The training was to occur in China, South Africa, and other locations both known and unknown to the grand jury.

    b. In order to enhance the training they were providing, Coconspirators F and H sought an aircraft specifically designed for training naval aviators in carrier aviation. A T-2 Buckeye ("T-2") was such an aircraft. Coconspirator C, at the behest of Coconspirators A, B, H and F, purchased a T-2 from the U.S. Aircraft Dealer and provided false information to the U.S. Aircraft Dealer in order to cause the U.S. government to issue a license authorizing the export of the T-2 from the United States to Coconspirator C in South Africa. Coconspirator G traveled to the United States on behalf of Coconspirator H in order to prepare the T-2 for shipment. Neither DUGGAN nor his co-conspirators applied for a license to re-transfer the T-2 to Coconspirator H.

    c. The training provided by Coconspirator H required instructor pilots with knowledge and experience in naval aviation meeting North Atlantic Treaty Organization ("NATO") standards. To that end, Coconspirator H contracted with DUGGAN, Coconspirator E, and others both known and unknown to the grand jury. DUGGAN provided military training to PRC military pilots by, with, and through Coconspirator H in or around October-November 2010, March 2012, November 2012, and other times

both known and unknown to the grand jury.

  d. DUGGAN also negotiated directly with Coconspirators F and B to provide additional defense services to the state-owned entity of the PRC. These services included the evaluation of military pilot trainees, testing of naval aviation related equipment, and instruction on the tactics, techniques, and procedures associated with launching aircraft from, and landing aircraft on, a naval aircraft carrier. DUGGAN received financial compensation from Coconspirator F for his services.

  e. Neither DUGGAN nor any of his coconspirators applied for a license from the United States government to provide defense services to any foreign nationals.

## Overt Acts

25. In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the coconspirators committed or caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

  a. In or around November 2009, Coconspirator C traveled to the United States to inspect a decommissioned T-2 for sale by a private seller located in the United States (the "U.S. Aircraft Dealer").

  b. On or about May 27-28, 2010, Coconspirator E exchanged email communications with DUGGAN in which Coconspirator E indicated he was in South Africa instructing Chinese pilots in Field Carrier Landing Practice and identified Coconspirator D as the individual running the training. DUGGAN responded that he knew Coconspirator D well.

  c. On or about August 5, 2010, Coconspirator D sent an email to Coconspirator B informing Coconspirator B that Coconspirator D understood T-2 and

Navy training requirements and acknowledged that an application for an export license for the T-2 had been submitted.

   d. On or about August 20, 2010, Coconspirator C signed a purchase agreement with the U.S. Aircraft Dealer for the T-2.

   e. On or about August 24, 2010, Coconspirators B and D exchanged emails regarding the status of the T-2, Coconspirator D's planned visit to Beijing, PRC with a former U.S. Navy F-18 Pilot, and Landing Signal Officer ("LSO") training.

   f. On or about August 25, 2010, Coconspirator B informed Coconspirator D that once the T-2 status was confirmed, they would plan for Coconspirator D to visit the PRC and discussed a LSO training course for the end of October.

   g. On or about September 2, 2010, Coconspirator C signed a U.S. Department of State Nontransfer and Use Certificate for the T-2. Coconspirator C falsely certified that he was the end user of the T-2. He also falsely certified that he would "not re-export" or "resell" the T-2 outside of South Africa or "to any other person."

   h. On or about September 20, 2010, Coconspirator D sent an email to DUGGAN, in which Coconspirator D described aircraft carrier training Coconspirator D had been conducting for Chinese pilots and solicited DUGGAN's help in conducting that training.

   i. On or about October 21, 2010, Coconspirator D emailed Coconspirator B that Coconspirator G was traveling to the United States to help prepare the T-2 for shipping.

   j. In or around November 2010, DUGGAN provided aviation services in the PRC.

k.  On or about December 25, 2010, Coconspirator B sent an email to a Coconspirator F employee stating, "Dan Daggan [sic]" would be giving a presentation on January 11, 2011, "on Personal Development Training: The Fighter Pilot's Guide to Mission Success."

l.  On or about January 11, 2011, Coconspirator F made a payment to DUGGAN in the amount of 9,500 Australian dollars ("AUD") for "Personal Development Training."

m.  On or about January 12, 2011, Coconspirator D sent an email to Coconspirators B and A with proposals for their consideration. The proposals included a T-2 course and a formal proposal for a LSO course combined with T-2 training. The proposals included a list of Coconspirator H's staff, including DUGGAN.

n.  On or about February 20-28 2011, DUGGAN traveled from Australia to Beijing, PRC and returned to Australia.

o.  On or about February 28, 2011, Coconspirator F paid DUGGAN AUD 9,500.

p.  On or about March 3, 2011, Coconspirator B sent an email to Coconspirators A and D requesting to combine Navy LSO training with other training.

q.  On or about March 22, 2011, Coconspirator F paid DUGGAN AUD 9,500.

r.  Between on or about March 25 and 31, 2011, DUGGAN visited the PRC.

s.  On or about March 29, 2011, Coconspirators B and D exchanged emails discussing further changes to a training schedule following delays in the T-2's readiness. Coconspirator A was copied on the emails. Coconspirator B specifically indicated that T-

2 training would be delayed until June 2011.

t.  In or around March 2011, DUGGAN drafted and gave to Coconspirator B a multi-page assessment that reviewed aspects of the PRC's aircraft carrier training program and proposed carrier aviation training-related services.

u.  On or about April 6, 2011, Coconspirator C sent an email to the U.S. Aircraft Dealer that sold him the T-2 acknowledging that he received a copy of the export license for the T-2.

v.  On or about April 29, 2011, Coconspirator F made a payment of AUD 9,900 to DUGGAN for "Personal Development Training."

w.  On or about May 9, 2011, Coconspirator B created a document titled, "[Conconspirator F]/DSQ Naval Aviation Indoctrination Course," which included course titles that referenced aircraft carrier training instruction and listed DUGGAN and Coconspirator B as presenters.

x.  In or around May 2011, Coconspirator B created a document titled: "Carrier Pilot Aviation Indoctrination Course" ("Course"), which outlined a proposed class that included topics such as LSO recording and scoring; Introduction to Field Carrier Landing Practice; and "FULL LSO GROUND SCHOOL."  The Course stated, "[a]ll presentation given by DSQ & [Coconspirator B's initials]."

y.  On or about June 9, 2011, Conspirator B created a resume of DUGGAN written in Chinese and English.  The resume described DUGGAN's military training history, assignments and flight history, including aircraft carrier takeoff and landings and LSO training.

z.  On or about June 9, 2011, an employee of Coconspirator F sent an email

to DUGGAN and Coconspirator B informing DUGGAN that he would not be coming to the PRC in June.

aa. DUGGAN visited the PRC from on or about July 29 to on or about August 3, 2011.

bb. On or about July 29 and August 5, 2011, Coconspirator F made two separate payments, each in the amount of AUD 9,900, to DUGGAN for "Personal Development Training."

cc. On or about August 8, 2011, Coconspirator B drafted a PowerPoint presentation that included diagrams and illustrations of an aircraft carrier optical landing system and references to LSO procedures, Field Carrier Landing Practice, and the ITAR.

dd. On or about September 6, 2011, Coconspirator C registered the T-2 with the South African Aviation Authority.

ee. Between on or about September 25, 2011 and October 10, 2011, DUGGAN traveled from the United States to South Africa and returned to the United States.

ff. On or about October 22, 2011, DUGGAN traveled from the United States to the PRC. Coconspirator F paid for the trip.

gg. In or around November 2011, Coconspirator F made three separate payments to DUGGAN for "Personal Development Training." Each payment was between AUD 9,900 and 9,850.

hh. On or about February 26, 2012, DUGGAN traveled to Huludao, PRC.

ii. In or around March 2012, Coconspirator F paid travel expenses for DUGGAN to travel to Shengyang, PRC and from Beijing, PRC to George, South Africa.

11

jj.     Between on or about March 5, 2012 and April 15, 2012, DUGGAN provided defense services in connection with the military training described in the documents referenced in Overt Acts t, w, x, and/or cc, to Chinese pilots in South Africa.

kk.     On or about May 13, 2012, DUGGAN traveled to the PRC. He returned to Australia on or about May 20, 2012.

ll.     Between on or about June 13 and July 3, 2012, DUGGAN and Conconspirator B communicated about training schedules and payments to DUGGAN for his services. DUGGAN instructed Coconspirator B to send payments in 24-hour intervals.

mm.     On or about June 18-20, 2012, DUGGAN and Coconspirator B exchanged emails regarding the timing of DUGGAN's next trip to the PRC and the next training class in South Africa.

nn.     On or about July 3, 2012, DUGGAN sent Coconspirator B three invoices and asked Coconspirator B to pay the invoices in 24-hour intervals.

oo.     On or about July 4, 5, and 6, 2012, Coconspirator F made three separate payments to DUGGAN, each in the amount of AUD 9,500.

pp.     On or about September 10, 2012, DUGGAN, while in the PRC, was negotiating the terms of his services and wrote in an email that he hoped his children would be set for life as a result.

qq.     On or about November 5, 2012, an employee of Coconspirator F emailed Coconspirator B a spreadsheet detailing payments to DUGGAN.
Between on or about November 5, 2012 and November 27, 2012, DUGGAN provided defense services in connection with the military training described in the documents

referenced in Overt Acts t, w, x, and/or cc, to Chinese pilots in South Africa.

**(Conspiracy to Unlawfully Export Defense Services to the People's Republic of China and to Defraud the United States**, in violation of Title 18, United States Code, Section 371)

## COUNT TWO

**(Violation of the Arms Export Control Act and International Traffic in Arms Regulations)**

26. The allegations set forth in Paragraphs 1 through 21 and 23 through 25 of this Indictment are hereby incorporated and re-alleged as if set forth here in full.

27. Between on or about March 5, 2012, and April 15, 2012, DUGGAN, a United States citizen, and others known and unknown to the Grand Jury, did willfully violate and attempt to violate the Arms Export Control Act and International Traffic in Arms Regulations, by exporting, attempting to export, and proposing to export, defense services to the People's Republic of China without a license or authorization obtained from the United States Department of State.

**(Violation of the Arms Export Control Act and International Traffic in Arms Regulations, Title 22, United States Code, Section 2778, and Title 22, Code of Federal Regulations, Parts 126.1 and 127.1)**

## COUNT THREE

**(Violation of the Arms Export Control Act and International Traffic in Arms Regulations)**

28. The allegations set forth in Paragraphs 1 through 21 and 23 through 25 of this Indictment are hereby incorporated and re-alleged as if set forth here in full.

29. Between on or about November 5, 2012 and November 27, 2012, DUGGAN, a United States citizen, and others known and unknown to the Grand Jury, did willfully violate and attempt to violate the Arms Export Control Act and International Traffic in Arms Regulations,

by exporting, attempting to export, and proposing to export, defense services to the People's Republic of China without a license or authorization obtained from the United States Department of State, located in Washington, D.C.

**(Violation of the Arms Export Control Act and International Traffic in Arms Regulations,**
Title 22, United States Code, Section 2778, and Title 22, Code of Federal Regulations, Parts 126.1 and 127.1)

### COUNT FOUR

### (Conspiracy to Launder Money)

30. The allegations set forth in Count One are hereby incorporated and re-alleged as if set forth here in full.

31. Beginning in or around November 2009, and continuing up to and including on or about November 27, 2012, within the District of Columbia and elsewhere, DUGGAN did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(h).

### The Object of the Conspiracy

32. The objects of the conspiracy were:

    a. To violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States, that is, Australia, or to a place in the United States from or through a place outside the United States, that is, the People's Republic of China, and South Africa, with the intent to promote the carrying on of specified unlawful activity, that is, export control violations under the Arms Export Control Act, Title 22, United States Code, Section 2778; and

14

b. to illegally enrich the co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

33. The manner and means by which DUGGAN and others known and unknown to the Grand Jury sought to accomplish the objects of the conspiracy included, among others, the following:

    a. DUGGAN and other conspirators planned and acted to export defense articles and services.

    b. DUGGAN and other conspirators wired money in U.S. dollars, which traveled through the United States, as payment for the purchase of defense articles and services.

(**Conspiracy to Launder Money,** in violation of Title 18, United States Code, Section 1956(h))

## FORFEITURE ALLEGATION

1. Upon conviction of any of the offenses alleged in Counts One through Three of this Indictment, DUGGAN shall forfeit to the United States: (a) any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and (b) any arms or munitions of war or other articles, and any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles, pursuant to 22 U.S.C. § 401. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses.

2. Upon conviction of the offense alleged in Count Four of this Indictment,

DUGGAN shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

3. The Grand Jury finds by probable cause that the following specific properties are subject to forfeiture upon conviction of the offenses alleged in Counts One through Four:

    a. 102 Pipeclay Esplanade, Cremone, Tasmania, Australia; and

    b. 565 Fountaindale Road, Jamberoo, New South Wales, Australia.

4. If any of the property described above as being subject to forfeiture, as a result of any act or omission of Defendant Daniel E. DUGGAN:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party:

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

DUGGAN shall forfeit to the United States any other property of DUGGAN, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p)

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1), and Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

*[signature]*
Attorney of the United States in
and for the District of Columbia